No. 14-35552

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

STUDENT,

*Defendant-Appellant*

V.

FOREST GROVE SCHOOL DISTRICT,

*Plaintiff- Appellee*

---

ON APPEAL FROM UNITED STATES DISTRICT COURT

for the DISTRICT OF OREGON

THE HONORABLE JOHN V. ACOSTA, U.S. MAGISTRATE JUDGE

CIVIL CASE NO. 3:12-CV-01837-AC

---

**DEFENDANT- APPELLANT'S OPENING BRIEF**

---

DIANE WISCARSON

WISCARSON LAW

A PROFESSIONAL CORPORATION

510 SW 3RD AVE., SUITE 439

PORTLAND, OREGON 97204

(503) 727-0202; (503) 727-0303 FAX

TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......................................................................**4**

**STATEMENT OF JURISDICTION**.......................................................**6**

**ISSUES PRESENTED FOR REVIEW**....................................................**6**

**STATEMENT OF THE CASE**................................................................**6**

**SUMMARY OF THE ARGUMENT** ...................................................**11**

**STANDARD OF REVIEW** ...................................................................**13**

**ARGUMENT** ..........................................................................................**13**

    I.   THE DISTRICT COURT IMPROPERLY GAVE ALJ MESSECAR'S FINAL ORDER
    LITTLE DEFERENCE, BECAUSE THE UNDERLYING ADMINISTRATIVE HEARING LASTED
    12 DAYS, INCLUDED THE TESTIMONY OF 20 WITNESSES, AND ALJ MESSECAR'S
    FINAL ORDER WAS WELL-REASONED, THOROUGH, AND CAREFUL. .........................13

    II.   THE DISTRICT COURT IMPROPERLY HELD DISTRICT COMMITTED HARMLESS
    PROCEDURAL VIOLATIONS OF THE IDEA, BECAUSE DISTRICT DENIED PARENTS THE
    OPPORTUNITY TO MEANINGFULLY PARTICIPATE IN THE IEP DEVELOPMENT
    PROCESS, THUS DENYING STUDENT A FAPE. ........................................................15

        A.   The district court improperly held District committed harmless error by
        failing to provide PWN documenting its refusal to provide services, because
        failing to provide PWN denied Parents the opportunity to meaningfully
        participate in developing Student's IEP, thus denying Student a FAPE............18

        B.   The district court properly held District committed harmful error by
        failing to consider Parents' private evaluation of Student, because the IDEA
        requires school districts to consider parent-initiated evaluations.....................21

    III.   THE DISTRICT COURT IMPROPERLY HELD DISTRICT PROVIDED STUDENT A
    FAPE, BECAUSE DISTRICT COMMITTED SUBSTANTIVE VIOLATIONS OF THE IDEA IN
    THE AREAS OF EVALUATION, IEP IMPLEMENTATION, AND PLACEMENT THAT DENIED
    STUDENT A FAPE. ..............................................................................................22

        A.   District failed to properly evaluate Student in all areas of suspected
        disability and failed to evaluate Student's transition needs with age appropriate
        assessments, thus denying Student a FAPE. .....................................................22

B.    The district court improperly held District provided Student a FAPE, because District failed to create and implement an IEP reasonably calculated to provide Student with educational benefit. ..........................................................25

*i. The district court erred in holding the PLs, AGs, and STOs in Student's IEPs were objectively measurable, because they were not linked to baseline data. ................................................................................................26*

*ii. The district court improperly held progress reports are not required under the IDEA, because progress reports are explicitly required under 20 U.S.C. § 1414(d)(1)(A).................................................................................28*

*iii. The district court improperly held that Student's IEPs were reasonably calculated to meet Student's unique needs, because the IEP team failed to review Student's IEPs after receiving information that showed Student's lack of progress and failed to adopt teaching methods that provided Student with educational benefit. ........................................................................30*

*iv. The district court improperly held that transition plans for Student in the March 2011 and November 2011 IEPs were appropriate, because they were not based on age-appropriate, child-specific transition assessments............32*

*v. The district court properly held District did not adequately address Student's anxiety in the March 2011 and November 2011 IEPs but improperly held District adequately addressed Student's anxiety in the May 2009 and April 2010 IEPs, because District's failure to address Student's exhibited anxious behaviors at school shows the IEPs were not reasonably calculated to provide Student educational benefit. ........................................34*

C.    The district court improperly held that District's placement of Student was appropriate, because District predetermined Student's placement and the district court failed to consider the proper factors in judging the sufficiency of Student's educational placement. ......................................................................38

**CONCLUSION**....................................................................................40

**CERTIFICATE OF COMPLIANCE** ...............................................................42

# TABLE OF AUTHORITIES

## CASES

*Adams v. Oregon*, 195 F.3d 1141 (9th Cir. 1999) ...................................................27

*Amanda J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877 (9th Cir. 2001) ........... 15, 26, 35

*Bd. of Educ. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176 (1982) . 13, 17, 26, 35

*Burke County Bd. of Educ. v. Denton*, 895 F.2d 973 (4th Cir. 1990)......................15

*County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3D 1458 (9TH CIR. 1996) ...............................................................................................................13

*Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038 (9th Cir. 2013).................. 16, 17

*Honig v. Doe*, 484 U.S. 305 (1988) .......................................................................17

*J.W. v. Fresno Unified Sch. Dist.*, 626 F.3D 431 (9TH CIR. 2010)..................... 14, 27

*L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3D 900 (9TH CIR. 2008)........ 13, 14, 16

*M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634 (9th Cir. 2005)...............................16

*M.M. v. Dist. 0001 Lancaster County Sch.*, 702 F.3d 479 (8th Cir. 2012)..............35

*Park v. Anaheim Union High Sch. Dist.*, 464 F.3D 1025 (9TH CIR. 2006) ...............14

*Roland M. v. Concord Sch. Comm.*, 910 F.2d 983 (1st Cir. 1990).........................16

*Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398 (9th Cir. 1994) ....39

*Schaffer v. Weast*, 546 U.S. 49 (2005)...................................................................17

*Shapiro v. Paradise Valley Unified Sch. Dist.*, 317 F.3d 1072 (9th Cir. 2003) ......13

*Van Duyn v. Baker Sch. Dist.*, 481 F.3d 770 (9th Cir. 2007) ........................... 26, 30

*W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479 (9th Cir. 1992) ......................................................................... 15, 16, 18, 19, 38

## STATUTES

20 U.S.C. § 1400.............................................................................................. 15, 18

20 U.S.C. § 1414....................................... 22, 23, 24, 25, 26, 27, 28, 32, 33, 34, 35

20 U.S.C. § 1415....................................................................................................6

28 U.S.C. § 1291....................................................................................................6

28 U.S.C. § 1331....................................................................................................6

OTHER AUTHORITIES

34 C.F.R. ch. 3, app. A § II & question 5 (1999) ....................................17

34 C.F.R. ch. 3, app. A § II & question 9 (1999) ....................................18

REGULATIONS

34 C.F.R. § 300.23 ..................................................................................18

34 C.F.R. § 300.324 ................................................................................30

34 C.F.R. § 300.34 ..................................................................................33

34 C.F.R. § 300.39 ..................................................................................33

34 C.F.R. § 300.501 ................................................................................38

34 C.F.R. § 300.502 ................................................................................21

34 C.F.R. § 300.503 ................................................................................19

34 C.F.R. § 300.507 ................................................................................22

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction in the case under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415(i)(2) and (3)(A) and 28 U.S.C. § 1331. The district court entered judgment on June 20, 2014, which constitutes a valid final order for purposes of this appeal. Student filed a notice of appeal on June 30, 2014. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.  Under the IDEA, does a federal district court fail to give an ALJ's opinion due weight when it gives little deference to the ALJ's well-reasoned, sixty-nine page final order following a 12-day hearing with the testimony of 20 witnesses?

2.  Under the IDEA, does a school district fail to provide a free appropriate public education (FAPE) to a student when it fails to provide prior written notice (PWN) when services are changed and when it ignores private evaluations provided by the student's parents?

3.  Under the IDEA, does a school district fail to provide a FAPE to a student when it fails to properly evaluate the student for transition needs and in all areas of suspected disability, fails to create and implement an Individualized Education Program (IEP) reasonably calculated to provide the student with educational benefit, and fails to consider alternate educational placements for the student?

## STATEMENT OF THE CASE

In July 2005, Student and Parents moved into the geographic boundaries of Forest Grove School District (District). ER 694-95. In 2008, Student began attending a District school, and District conducted its first comprehensive evaluations of Student, which identified concerns in communication, reading, math, writing, fine motor skills, emotional regulation, depression, anxiety, social skills, personal

hygiene, executive functioning skills, adaptive skills, low cognitive skills, and Attention Deficit Hyperactivity Disorder (ADHD). *See* ER 638-46; *see also* ER 614-37, 697. District found Student eligible for special education under the disability category of Autism Spectrum Disorder (ASD) on May 14, 2008, despite evaluation results that documented Student did not have ASD. ER 612-13; *see* ER 618-22.

On May 28, 2009, District convened an Individualized Education Program (IEP) meeting and developed an IEP intended to serve Student through May 27, 2010 (2009 IEP). ER 597-609. The 2009 IEP failed to address most of Student's identified needs. *See id.*; *see also* ER 614-22, 627-35, 647-67. On December 10, 2009, District convened an IEP meeting to discuss additional strategies to meet Student's needs and identified various teaching methods Student needed in order to receive an appropriate education but were not addressed in the 2009 IEP. ER 594-96, 767. Despite knowing Student's instructional needs, District did not change Student's IEP to reflect those identified needs. *Id.*

In March 2010, District evaluated Student's academic skills and identified needs for specially designed instruction (SDI). ER 585-91. Despite an unexplained discrepancy between Student's academic achievement scores and her IQ score, District did not request consent for, or perform, any evaluations. ER 784. *See also* ER 585-91, 597-609, 627-35.

On April 2, 2010, District convened an IEP meeting and developed an IEP intended to serve Student through April 1, 2011 (2010 IEP). ER 551-67. The 2010 IEP failed to address most of Student's identified needs. *See id.*; *see also* ER 585-91, 597-609, 614-22, 627-35, 647-67. Student turned 16 while the 2010 IEP was in effect, but the 2010 IEP did not contain any information regarding transition services. *See* ER 551-67, 699.

On December 14, 2010, Robin McCoy, M.D. (Dr. McCoy), a Developmental and Behavioral Pediatrician at the Child Development and Rehabilitation Center (CDRC), and a team of specialists evaluated Student. ER 523-50. The evaluation found Student did not meet the criteria for ASD. ER 545-50. Parents provided District with a copy of the evaluation promptly after it was written. ER 707, 789. Bob Buckendorf, Ph.D., Speech-Language Pathologist (Dr. Buckendorf), evaluated Student on February 9, 2011, and identified a mixed expressive and receptive language disorder. ER 512-15. Parents also provided this evaluation to District shortly after it was completed. ER 711. In March 2011, a District psychologist evaluated Student and identified concerns related to clinically significant anxiety. ER 508-11.

On March 29, 2011, District convened an IEP meeting to renew Student's eligibility and developed an IEP intended to serve Student through March 28, 2012. *See* ER 480-94, 501-03. The IEP team found Student eligible for special education

under the disability categories of Intellectual Disability (ID) and Other Health Impairment (OHI). ER 497-500, 837-38. At the March 29, 2011 IEP meeting, the team also found Student eligible under the disability category of ASD. ER 495-96, 814-15; *see* ER 545-50.

In July 2011, Student had a psychotic episode so severe it required 24-hour supervision. ER 471-74. As a result of this psychotic episode, Kenneth Ensroth, M.D. (Dr. Ensroth) at Mind Matters, PC, evaluated Student and began mental health counseling. ER 352-60. Parent notified District of Student's episode and that Student might not come back to school. ER 725-28. In August 2011, Dr. Buckendorf evaluated Student. ER 468-70. Parents provided Dr. Buckendorf's report to District. ER 792, 897.

On September 6, 2011, District convened an IEP meeting. ER 883-84; *see* ER 402-11. At the meeting, Parents requested two hours per week of speech and language services from District. ER 408. District denied Parents' request to increase speech language services. *Id.*; ER 890. However, after the IEP meeting and without any discussion with Parents, District decided to increase speech language services from thirty to sixty minutes weekly. ER 771-72, 889-93. After unilaterally deciding to change Student's speech language services, District contacted Parent to offer the increased speech language services. ER 735-36, 750.

On October 3, 2011, Dr. Ensroth reevaluated Student, and District convened an evaluation planning meeting. ER 356, 398. At the meeting, District decided no further evaluations were needed to address Student's needs, despite Parents' request for further evaluation and Student's mental breakdown. ER 398. Also in early October, District informed Parents that if they wanted to talk to District's transition specialist about transition planning for Student, Parents would have to arrange a time on their own despite the fact Student was already 16. ER 391.

District convened a two-part IEP meeting on November 3 and 14, 2011, and developed an IEP intended to serve Student until November 2, 2012 (November 2011 IEP). *See* ER 364-90. The November 2011 IEP also suffered many problems. ER 369-84. At the November 14, 2011 IEP meeting, Parents informed District they did not agree with District's assessments of Student and wanted a complete reevaluation or an IEE. ER 367; Ex. S157 at 46:00-48:00 (Leave to transmit this exhibit was requested in Defendant-Appellant's Motion to Transmit Physical and Documentary Exhibits, which was submitted to this Court on the same day this brief was filed.).

On December 2, 2011, Parents discussed transition services with District's transition coordinator for the first time. ER 675. The December 2, 2011 meeting was not an IEP meeting and was arranged by Parents. *Id.* By December 5, 2011, District still had not conducted any age-appropriate transition assessments, so Parents

renewed their request that District conduct age-appropriate transition assessments. ER 361. On December 5, 2011, Parents again requested an increase in Student's speech and language SDI and that District provide social skills instruction to Student. *Id.*

On December 6, 2011, Student filed a due process complaint. ER 296-348. The Office of Administrative Hearings assigned the case to Administrative Law Judge (ALJ) Jill Messecar on April 10, 2012. ER 290-95. The hearing lasted for 12 days. ER 222. ALJ Messecar issued a final order on September 12, 2012. ER 222-89. District sought review of the final order, and Student cross-appealed to the United States District Court for the District of Oregon. ER 80-213. The district court entered judgment on June 9, 2014. ER 1-66.

## SUMMARY OF THE ARGUMENT

District committed procedural and substantive errors under the IDEA that denied Student a FAPE. The district court erred by applying the improper standard of deference to the ALJ's opinion. The district court further erred in finding District's procedural errors harmless, because District denied Parents the opportunity to meaningfully participate in the IEP development process by failing to provide PWN to document its refusals to provide services and by ignoring Parents' private evaluations of Student.

In addition, the district court erred in overturning several of the ALJ's holdings regarding District's substantive denial of FAPE to Student while properly affirming select holdings in Student's favor. District committed substantive violations that denied Student a FAPE in the areas of evaluation, IEP implementation, and placement. Specifically, District failed to evaluate Student's transition needs and failed to evaluate Student's anxiety after Student suffered a mental breakdown. District also failed to create IEPs with objectively measurable present level (PL) statements, annual goals (AGs), and short-term objectives (STOs); failed to provide progress reports to Parents; failed to adequately address Student's anxiety; failed to create appropriate transition plans; and failed to reevaluate the effectiveness of Student's IEPs. Finally, District failed to adopt teaching methods that provided Student with educational benefit and predetermined Student's educational placement. This Court should overturn the district court's holdings in District's favor and restore all remedies granted by ALJ Messecar. In addition, Parents renew their request made at the district court for attorneys' fees, expenses, and costs incurred in the due process hearing, the district court appeal, and in the appeal to this Court. Parents ask that this Court grant any additional relief it deems just and proper.

## STANDARD OF REVIEW

Questions of law under the IDEA are reviewed de novo. *Shapiro v. Paradise Valley Unified Sch. Dist.*, 317 F.3d 1072, 1076 (9th Cir. 2003), *superseded on other grounds by* 20 U.S.C. § 1414(d)(1)(B).

## ARGUMENT

I. THE DISTRICT COURT IMPROPERLY GAVE ALJ MESSECAR'S FINAL ORDER LITTLE DEFERENCE, BECAUSE THE UNDERLYING ADMINISTRATIVE HEARING LASTED 12 DAYS, INCLUDED THE TESTIMONY OF 20 WITNESSES, AND ALJ MESSECAR'S FINAL ORDER WAS WELL-REASONED, THOROUGH, AND CAREFUL.

The district court erroneously gave ALJ Messecar's Final Order little deference, because the ALJ's opinion was thorough and careful. The IDEA requires a reviewing court to receive the records of the administrative proceedings, thus the Supreme Court has held there is an "implied requirement that due weight shall be given to those proceedings." *Bd. of Educ. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). In acknowledging the administrative agency's expertise, the court "must consider [the agency's] findings carefully and endeavor to respond to the hearing officer's resolution of each material issue" and must accord more deference to agency findings it considers "thorough and careful." *See L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 908 (9th Cir. 2008) (citing *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996)).

In addition to the thoroughness of the ALJ's legal analysis, the court looks at the length of the hearing, the number of witnesses called to testify, and the length of

the opinion rendered when determining the amount of deference that should be given to an ALJ's opinion. *See Capistrano*, 556 F.3d 900; *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431 (9th Cir. 2010); *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir. 2006). In *Capistrano*, where the hearing lasted four days and twelve witnesses were called, this Court found the "ALJ's twenty page opinion certainly meets that standard." 556 F.3d at 906, 908. Similarly, in *J.W.*, this Court held the ALJ's 38-page decision after a 10-day hearing contained a detailed factual background and analysis and should be given "due weight." 626 F.3d at 441.

Here, the hearing before ALJ Messecar lasted 12 days and included the testimony of 20 witnesses. ER 222-23. In her sixty-nine page Final Order, ALJ Messecar extensively describes the facts over forty-five pages, cites relevant sections of the IDEA and its implementing regulations, and cites important case law throughout her analysis. ER 222-89. The Final Order addresses each issue raised by Parents and breaks down the analysis by each specific IEP. *See id.* Thus, ALJ Messecar's opinion was well-reasoned, thorough, and careful.

However, the district court gave ALJ Messecar's opinion very little deference. ER 19-21. In support of this finding, the district court states the ALJ fails to support her conclusions with case law, ignored contradictory evidence, and makes "little to no mention" of witness testimony. *Id.* Contrary to the district court's opinion, ALJ Messecar cites not only to the IDEA and its implementing regulations, but to case

law. *See* ER 222-89. In her findings of facts, ALJ Messecar references many portions of the transcript and the testimony of numerous witnesses. *Id.* The district court should have afforded ALJ Messecar's opinion much more deference because of the length of the opinion, the length of the hearing, the number of witnesses, and the analysis of and citations to applicable law, both statutory and case law. Thus, this Court should overturn the district court's holding that ALJ Messecar's opinion was entitled to little deference, because it was well-reasoned, thorough, and careful.

II.  THE DISTRICT COURT IMPROPERLY HELD DISTRICT COMMITTED HARMLESS PROCEDURAL VIOLATIONS OF THE IDEA, BECAUSE DISTRICT DENIED PARENTS THE OPPORTUNITY TO MEANINGFULLY PARTICIPATE IN THE IEP DEVELOPMENT PROCESS, THUS DENYING STUDENT A FAPE.

To "ensure that the rights of children with disabilities and parents of such children are protected," the IDEA guarantees a FAPE to children with disabilities. 20 U.S.C. § 1400(d)(1)(B). When analyzing whether an agency provided a student a FAPE, a court conducts a two-part inquiry. *Amanda J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 890 (9th Cir. 2001). First, the court considers whether the State complied with the procedures set forth in the IDEA, and second whether the IEP is reasonably calculated to enable the child to receive educational benefit. *Id.* If a court finds a procedural violation that denied a student a FAPE, the court need not address the second prong of the two-part inquiry. *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992) (citing *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir. 1990)).

Harmless procedural errors do not constitute a denial of FAPE. *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2008). However, procedural violations that: (a) "result in the loss of educational opportunity;" (b) "seriously infringe the parents' opportunity to participate in the IEP formulation process;" or (c) cause a "deprivation of educational benefit," clearly result in the denial of a FAPE. *Target Range*, 960 F.2d at 1484; *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990). Procedural errors rise to the level of a denial of FAPE where, absent the errors, there is a "strong likelihood" that alternative educational possibilities for the student "would have been better considered." *M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634, 657 (9th Cir. 2005) (Gould, J., concurring in part and concurring in the judgment). "Thus, an IEP team's failure to properly consider an alternative educational plan can result in a lost educational opportunity even if the student cannot definitively demonstrate that his placement would have been different but for the procedural error." *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1047 (9th Cir. 2013).

The district court held that allowing Parents to make requests at IEP meetings satisfied District's duty to provide Student a FAPE. *See* ER 28-29. However, mere parental attendance is not sufficient to satisfy the IDEA. In *Rowley*, the Supreme Court explained:

> It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents . . . a

> large measure of participation at every stage of the administrative
> process as it did upon the measurement of the resulting IEP against a
> substantive standard. We think that the congressional emphasis upon
> full participation of concerned parties . . . demonstrates the legislative
> conviction that adequate compliance with the procedures prescribed
> would . . . assure much if not all of what Congress wished in the way
> of substantive content in an IEP.

458 U.S. at 205-06 (citation omitted). As this Court has stated, "[p]arental participation in the IEP and educational placement process is central to the IDEA's goal of protecting disabled students' rights and providing each disabled student with a FAPE." *Doug C.*, 720 F.3d at 1043. *See also Honig v. Doe*, 484 U.S. 305, 311 (1988) ("Congress repeatedly emphasized throughout the [IDEA] the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness."). In *Schaffer v. Weast*, the Supreme Court reiterated the importance of parent participation when it said, "[t]he core of the [IDEA] . . . is the cooperative process that it establishes between parents and schools . . . ." 546 U.S. 49, 53 (2005). The district court's opinion directly conflicts with the IDEA, which requires that parents be treated as equal participants with school personnel in the IEP development process. 34 C.F.R. ch. 3, app. A § II & question 5 (1999). Specifically, the district court erroneously held District committed harmless error when District failed to provide PWN documenting its refusal to provide services, however, the district court properly held District

committed harmful error when District ignored Parents' private evaluations of Student.

    A. <u>The district court improperly held District committed harmless error by failing to provide PWN documenting its refusal to provide services, because failing to provide PWN denied Parents the opportunity to meaningfully participate in developing Student's IEP, thus denying Student a FAPE.</u>

District committed procedural violations under the IDEA when it failed to send PWN to Parents. The district court stated that "a parent's right to participate is not equivalent to the right to have all his or her requests adopted by the IEP team, because the District makes the ultimate decision regarding the extent of services its students require." ER 28 (citing *Target Range*, 960 F.2d at 1482). While it is correct to say that a parent does not have the right to "have all his or her requests adopted," it is incorrect to say that "the District makes the ultimate decision" about a student's services. Neither Parents nor District have unilateral decision-making authority or veto power. Decisions related to the content of a student's IEP are to be made by the IEP team, which includes the parents. 34 C.F.R. § 300.23. IEP team consensus is the IEP team's decision-making modality. 34 C.F.R. ch. 3, app. A § II & question 9 (1999).

A district does not "make the ultimate decision regarding the extent of services its students require," but instead, holds ultimate responsibility for ensuring that a student with disabilities receives FAPE. *See* 20 U.S.C. § 1400(d)(1)(B). According

to 34 C.F.R. § 300.503, if the team cannot reach consensus, a district may make a decision and must give parents prior written notice of that decision. 34 C.F.R. § 300.503 specifically provides:

> (a) Notice. Written notice that meets the requirements of paragraph (b) of this section must be given to the parents of a child with a disability a reasonable time before the public agency—
>
> (1) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or
>
> (2) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.

Thus, the district court confused the IEP team's decision-making power in the form of consensus with District's decision-making authority in the absence of consensus and ultimate responsibility to provide FAPE.[1]

Despite these mandates, District repeatedly ignored its obligation to send PWN. At a September 6, 2011 IEP meeting, Parents requested an increase in Student's speech services to two hours of speech therapy per week. ER 408. District

---

[1] The district court cited *Target Range* as support for its statement that "the District makes the ultimate decision" regarding Student's IEP. ER 28 (citing *Target Range*, 960 F.2d at 1482). However, the district court's quote is not related to who has the decision-making authority for the content of a student's IEP. *See id.*; *Target Range*, 960 F.2d at 1482. The quote actually comes from page 1486 of the *Target Range* opinion and describes school districts' procedural compliance obligations. *See* ER 28; *Target Range*, 960 F.2d at 1482-86. In *Target Range*, this Court stated that "the statute places the *responsibility* for the IEP process in the hands of the state and local education agencies." *Id.* (emphasis added). This language cannot be read to hold, or even imply, that school districts have authority to make ultimate decisions about a student's special education services.

verbally denied this request, but two District IEP team members agreed privately after the meeting to increase speech services from 30 minutes to one hour per week. ER 401, 409, 890-92. Parents received no PWN regarding this decision. ER 892-93.

District's failure to provide PWN for the increase in speech services was one of many such failures by District. In March 2010, District conducted an evaluation of Student without Parents' consent. ER 592, 764. At the November 14, 2011 IEP meeting, District refused to change Student's math class despite Parents' request. ER 366-67, 868. Parents disagreed with District's position that Student did not need occupational therapy (OT) services. ER 368. Parents received no PWN when District made any of these unilateral decisions. ER 593, 753-65; *see* ER 684. Given Parents' concerns, it is extremely likely that, if afforded the proper opportunity, alternative educational possibilities would have been better considered had Parents been given a proper opportunity to meaningfully participate.

The district court did not apply the correct standard in determining whether District's procedural violations were harmless. ER 24-29. The district court judged these errors harmless, because it presumed that the outcome was what Parents wanted. *Id.* However, the proper test is not whether Student's plan was related to Parents' request, but whether there is a "strong likelihood" that alternative educational possibilities for Student "would have been better considered." *Federal Way*, 394 F.3d at 657. Here, Parents advocated for changes to Student's education

that would have been better considered if their ability to properly participate had not been seriously infringed by District's failures to send PWN. Thus, District committed procedural errors that seriously infringed upon Parents' ability to meaningfully participate in the IEP process and denied Student a FAPE.

### B. The district court properly held District committed harmful error by failing to consider Parents' private evaluation of Student, because the IDEA requires school districts to consider parent-initiated evaluations.

District ignored Student's private evaluations to determine Student eligible for services under the category of Autism Spectrum Disorder (ASD), despite Student's evaluations stating otherwise. ER 243. 34 C.F.R. § 300.502 provides:

> (b) Parent-initiated evaluations. If the parent obtains an independent educational evaluation at public expense or shares with the public agency an evaluation obtained at private expense, the results of the evaluation—
> (1) Must be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child. . . .

On February 9, 2011, Dr. Bob Buckendorf, PhD, Speech-Language Pathologist (SLP), CCC (Dr. Buckendorf), diagnosed Student with a mixed receptive and expressive language disorder but not ASD. ER 512-15. Parents provided Dr. Buckendorf's evaluation to District shortly after the evaluation was completed. ER 711. However, District did not review Dr. Buckendorf's evaluation at the March 29, 2011 IEP meeting when it misidentified Student as autistic. ER 501-03, 712-13. District also ignored the evaluations of the CDRC and Dr. McCoy,

which all ruled out ASD as a diagnosis for Student. *See* ER 523-50. A proper identification of Student's disability would have created a strong likelihood that services more appropriate to Student's needs as a child with a mixed receptive and expressive language disorder, not ASD, would have been better considered. The district court properly found a harmful procedural violation in failing to review this evaluation, because District denied Parents the opportunity to meaningfully participate and denied Student a FAPE. ER 30-32.

III.  THE DISTRICT COURT IMPROPERLY HELD DISTRICT PROVIDED STUDENT A FAPE, BECAUSE DISTRICT COMMITTED SUBSTANTIVE VIOLATIONS OF THE IDEA IN THE AREAS OF EVALUATION, IEP IMPLEMENTATION, AND PLACEMENT THAT DENIED STUDENT A FAPE.

Parents may allege substantive violations of IDEA "relating to the identification, evaluation or educational placement of a child with a disability, or the provision of FAPE to the child." 34 C.F.R. § 300.507. Parents appeal the district court's rulings in District's favor in the areas of evaluation of Student, creation and implementation of Student's IEP, and Student's educational placement.

A.  District failed to properly evaluate Student in all areas of suspected disability and failed to evaluate Student's transition needs with age appropriate assessments, thus denying Student a FAPE.

Once a child has been found eligible under the IDEA for special education services, a school district is required to assess that child "in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B). Once a qualifying child is 16, the school district must also create "appropriate measurable postsecondary goals *based upon*

*age appropriate transition assessments* related to training, education, employment, and, where appropriate, independent living skills." *Id*. at § 1414(d)(1)(A)(i)(VIII)(aa) (emphasis added).

The district court concluded that District's failure to assess Student's transition needs was not an evaluation issue. ER 36-37. It held that the April 2010 IEP violated the IDEA, because it failed to provide transition services for Student. ER 47-48. On the other hand, the district court held that District created appropriate postsecondary transition goals in the March 2011 and November 2011 IEPs despite the fact that the goals were not based on any age appropriate transition assessments as required by the IDEA. ER 48-51.

By definition, a transition plan must be based on age appropriate transition assessments. 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa). It is impossible for District to create measurable postsecondary goals if District did not conduct transition assessments. *See id.* Thus, the district court improperly held evaluation for transition is not an evaluation issue and should have held District denied Student a FAPE by failing to evaluate Student's transition needs.

In addition, District denied Student a FAPE when it failed to evaluate Student after receiving information that Student had a mental breakdown during the summer between the 2010-11 and 2011-12 academic years. District conducted psychological evaluations of Student in May 2008 and March 2011, and both evaluations noted

clinically significant levels of anxiety. ER 508-11, 614-17. The district court held that those evaluations discharged District's duty to evaluate Student. ER 36. However, Student's breakdown occurred after the March 2011 evaluation. ER 471-74, 715-16, 722-23. In August 2011, Parents informed District about the mental breakdown and that Student might not be coming back to school. ER 725-27, 729-30. Despite this new information, District made no attempts to evaluate Student when Student returned to school in September 2011.

The IDEA provides:

(A) In general. A local educational agency shall ensure that a reevaluation of each child with a disability is conducted in accordance with subsections (b) and (c)—
   i.   If the local education agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or
   ii.   If the child's parents or teacher requests a reevaluation.

20 U.S.C. § 1414(a)(2). The district court holding that the previous two evaluations were sufficient to provide appropriate educational supports for Student in Fall 2011 was erroneous, because District had many reasons to believe Student needed more evaluation, including knowledge of Student's July 2011 breakdown, teacher reports of Student crying in class, and Student's constant fear of making mistakes. ER 810, 850, 853. The previous evaluations did not include any information related to those substantial developments, nor could the evaluation truly be considered to have assessed Student "in *all* areas of suspected disability," considering District had new,

important information regarding Student's mental condition. 20 U.S.C. § 1414(b)(3)(B). Thus, the district court erred in holding that District provided Student a FAPE when it failed to reevaluate Student after learning of Student's mental breakdown.

B. The district court improperly held District provided Student a FAPE, because District failed to create and implement an IEP reasonably calculated to provide Student with educational benefit.

The district court erred in holding that District provided Student a FAPE, because each of Student's IEPs was defective on its face, District failed to create an appropriate transition plan for Student, and District did not properly implement the IEPs. *See* ER 37-61. In addition, District did not properly reevaluate the effectiveness of the IEPs when new information about Student's performance was available. *See id.* However, the district court properly held that District did not sufficiently address Student's anxiety. ER 51-56.

The IDEA requires that an IEP contain, among other things:

(I) a statement of the child's present levels of academic achievement and functional performance, including—
    (aa) how the child's disability affects the child's involvement and progress in the general education curriculum . . .

        \*      \*      \*

(II) a statement of measurable annual goals, including academic and functional goals . . .
(III) a description of how the child's progress toward meeting the annual goals . . . will be measured and when periodic reports on the progress the child is making toward meeting the annual goals . . . will be provided . . . .

20 U.S.C. § 1414(d)(1)(A). The district court held that all relevant IEPs met these requirements in all areas other than transition and treatment of Student's anxiety. *See* ER 37-61. The district court erred, because the PLs, AGs, and STOs in all IEPs and in all skill areas were not objectively measurable, District failed to send progress reports, and District failed to revise Student's IEP when it had reason to believe the IEP was not reasonably calculated to meet Student's unique needs.

> *i. The district court erred in holding the PLs, AGs, and STOs in Student's IEPs were objectively measurable, because they were not linked to baseline data.*

The district court held that the PLs, AGs, and STOs were objectively measurable in all IEPs during the relevant time period.[2] *See* ER 37-61. The IEP is one of the "most important mechanisms" for ensuring that children with disabilities receive an education that meets the IDEA's "lofty goals." *Van Duyn v. Baker Sch. Dist.*, 481 F.3d 770, 776 (9th Cir. 2007). A state complies with the IDEA when the IEP "developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits." *Amanda J.*, 267 F.3d at 890 (quoting *Rowley*, 458 U.S. at 206-07). The court analyzes the substantive sufficiency of an IEP according to the "snapshot rule," which requires the court to look at what was

---

[2] It is not entirely clear what the district court's holding was as the district court failed to complete the sentence explaining its holding. *See* ER 41 ("The court disagrees for several reasons that the AGs and STOs were. [sic]"). However, the context of the section leads Student to believe that the district court found the AGs and STOs objectively measurable.

reasonable at the time the IEP was drafted. *J.W.*, 626 F.3d at 439 (quoting *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).

The district court used one self-management PL from the April 2010 IEP to support its holding that all PLs in all the relevant IEPs were appropriate. *See* ER 41. The PL stated that "[w]hen given directions, [Student] will verbally restate directions to the teacher when asked on 7/10 opportunities." *See id. See also* ER 558. When taken out of context, this does appear to be an objective level, however, PLs are only sufficient if the IEP includes some way to measure a student's progress on that particular skill. 20 U.S.C. § 1414(d)(1)(A). The AG and STOs in the April 2010 IEP do not mention anything about Student being able to "verbally restate directions to the teacher when asked." *See* ER 564. Thus, the PL the district court used as a sufficient example is not related to *any* AG or STO in that skill area. Without this link, it is impossible to call the PLs, AGs, and STOs measurable, objectively or otherwise.

In addition, the self-management PL the district court cited is the only one of its kind in the April 2010 IEP. *See* ER 551-67. The remaining PLs did not contain objective baseline data. *See id.* The other IEPs suffered from similar flaws in that either the PLs did not contain objective standards or they were not linked to measurable AGs or STOs. *See* ER 369-84, 480-94. For example, the March 2011 IEP PLs used reading data at a 6th grade level, but the AGs and STOs supposedly

linked to that PL were for 3rd, 4th, and 5th grade reading passages. ER 484, 490. Linking 6th grade reading data to 3rd, 4th, and 5th grade reading standards is meaningless, because there is no way to track whether Student made progress by comparing different grade level standards. Thus, Student's IEPs contained no objectively measurable standard by which District could track Student's progress.

The PLs, STOs, and AGs in the other IEPs all suffered from similar flaws. *See* ER 369-84, 480-94, 551-67, 597-609. Thus, the district court's holding that District provided Student a FAPE misconstrues the meaning of objectively measurable PLs, AGs, and STOs under the IDEA. Therefore, this Court should overturn the district court's holding that the PLs, AGs, and STOs in Student's IEPs were objectively measurable.

> *ii. The district court improperly held progress reports are not required under the IDEA, because progress reports are explicitly required under 20 U.S.C. § 1414(d)(1)(A).*

The IDEA explicitly requires that an IEP contain "a description of how the child's progress toward meeting the annual goals. . . will be measured and when periodic reports on the progress the child is making toward meeting the annual goals . . . will be provided . . . ." 20 U.S.C. § 1414(d)(1)(A). The district court stated, ". . . [T]he IDEA does not require a District to deliver progress notes, and the court is not persuaded that timely progress reports are required to create an IEP that is 'reasonably calculated to enable the child to receive educational benefits.'" ER 32.

This statement directly contradicts the IDEA, and thus, the district court improperly held that Student did not have a right to progress notes.

District repeatedly failed to provide adequate, timely progress reports to Parents regarding Student's progress. *See* ER 583-84, 605-07. The progress notes that District did produce often did not contain data linked or related to AGs or STOs to inform Parents whether Student was making progress on those objectives. *See* ER 477, 516-20, 583-84, 605-07. In March 2010, District prepared progress notes for Student that it did not share with Parents during the 2009-10 academic year. ER 583-84, 702. Parents did not receive the June 2011 progress notes until September 2011. ER 703-04. They likewise did not receive Student's January 2011 progress notes until the summer of 2011. ER 710. District did not provide progress notes with the April 2011 report card. ER 478-79. The June 2011 progress notes were blank for the Transition Math and Transition Writing AGs and STOs on the March 2011 IEP. [3] ER 477. Thus, this Court should overturn the district court's holding that District provided Student a FAPE, because District failed to provide adequate, timely progress reports as required by the IDEA and thus denied Student a FAPE.

---

[3] It should also be noted that between submitting the June progress notes to Parents and submitting them as evidence in the due process hearing, District added information for those AGs and STOs. *See* ER 475, 477.

*iii. The district court improperly held that Student's IEPs were reasonably calculated to meet Student's unique needs, because the IEP team failed to review Student's IEPs after receiving information that showed Student's lack of progress and failed to adopt teaching methods that provided Student with educational benefit.*

The district court improperly held that all relevant IEPs were reasonably calculated to provide Student educational benefit despite District's failure to revise Student's IEP when new information put District on notice that Student was failing to make progress. *See* ER 56-62. School districts have a duty to review a child's IEP and to revise the IEP "to address any lack of expected progress toward the annual goals . . . and in the general education curriculum" as well as "[t]he child's anticipated needs" or "[o]ther needs." 34 C.F.R. § 300.324(b)(1). A student's educational progress, or lack thereof, is probative, but not determinative, of whether the failure to implement the IEP was material. *Van Duyn*, 502 F.3d at 822.

During the 2009-10 academic year, Student showed many signs of a need for IEP revision, including academic achievement scores more than a full standard deviation above Student's most recent IQ score, extensive communication difficulties, extremely limited interactions with peers, and sensory concerns. ER 480-94, 508-15, 523-50, 585-91, 596, 613, 807, 811, 829. In addition, District knew of Student's fear of making mistakes, intense test-related anxiety, struggles with binder organization, need for a script before asking for help, and need for access to

after school clubs to build self-esteem and independence. ER 521-22, 594-96, 803, 806, 810, 819.

Student continued to show a lack of progress during the 2010-11 and 2011-12 school years. *See* ER 366-67, 385-90, 471-74, 715-16, 747-48, 793. For example, Parents expressed concern at the November 3, 2011 IEP meeting that Student had regressed in writing and had increased the amount of time needed to fasten clothing. ER 388. By December 2011, Student was not maintaining basic hygiene and had lost motivation for school. ER 359. All of this was in addition to Student's breakdown between the 2010-11 and 2011-12 academic years. *See supra* p. 9. This continued lack of progress and regression shows that none of the IEPs were reasonably calculated to provide educational benefit to Student, and thus, District denied Student a FAPE by failing to revise Student's IEPs.

In addition, the IEPs were not reasonably calculated to provide Student with educational benefit, because District refused to employ teaching methods that allowed Student to learn. Eric Larsen, Student's Language Arts teacher, testified that Student requires that large concepts be broken into small pieces. ER 821-24. The district court held that District did not have to use this method of instruction to provide educational benefit to Student despite the fact that the IEP team knew this method was successful with Student. ER 43; *see* ER 485. However, the IEP team agreed with Parents that this was not only the best method for Student, but the only

method by which Student could learn. *See* ER 485 ("To help [Student] better understand reading materials in all classes, it is best to check for understanding often through a sequence of simple comprehension questions. *Waiting until the end of a section of reading to check for understanding is too long.*") (emphasis added). By refusing to use a strategy that the IEP team knew was the only way Student could learn, District failed to create an IEP that provided Student with educational benefit and denied Student a FAPE.

> *iv. The district court improperly held that transition plans for Student in the March 2011 and November 2011 IEPs were appropriate, because they were not based on age-appropriate, child-specific transition assessments.*

Once a qualifying child is 16, the school district must create "appropriate measurable postsecondary goals based upon age appropriate transition assessments . . . ." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa). The district court held that District created appropriate postsecondary goals in the March 2011 and November 2011 IEPs despite failing to be based on age appropriate transition assessments as required by the IDEA. ER 48-51. *See supra* p. 22-23. As analyzed above, the district court's reasoning is circular, because, by definition, it is impossible for District to create appropriate postsecondary goals without any age appropriate transition assessments specific to Student's unique needs. 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa). *See supra* p. 22-23. Thus, this Court should overturn the district court's holding that District created appropriate transition plans for Student, because District could not

create measurable postsecondary goals for Student when it failed to evaluate Student's unique transition needs.

In addition, the district court vacated ALJ Messecar's order that District provide Student with a driver's education course as part of her transition plan, because the court found "no evidence that the District regularly provides drivers [sic] education courses, or that it is generally provided in an educational curriculum." ER 64; *see* ER 287; *see also* ER 377, 487. The district court stated that it found no authority "for the contention that a drivers [sic] education is a necessary part of a free adequate public education as contemplated by the IDEA." ER 64.

In contrast to the district court's holding, the IDEA clearly contemplates transition goals "related to training, education, employment, and . . . independent living skills." 20 U.S.C. § 1414 (d)(1)(A). From Student's IEP transition goals, it is clear that the IEP team determined that learning to drive was part of Student's plan to live independently, thus, providing a driver's education course is a necessary part of that goal. *See* ER 377, 487. In addition, special education, by definition, is not part of the regular "educational curriculum," and thus, the district court's statement is irrelevant to whether District must provide Student with driver's education.[4]

---

[4] The IDEA illustrates this point in the definitions of Special Education and Related Services found in 34 C.F.R. § 300.39 and 34 C.F.R. § 300.34. These non-exhaustive lists of services include "[s]kills in aquatics, dance, and individual and group games and sports (including intramural and lifetime sports); and . . . special physical education, adapted physical education,

However, even if the district court's contention were correct that in order to provide transition services, the services provided must be in the regular "educational curriculum," driver's education is part of District's educational curriculum and is contained in District's curriculum guide. ER 465. Thus, this Court should restore ALJ Messecar's remedy and any other relief it deems proper for Student's transition plan.

> *v. The district court properly held District did not adequately address Student's anxiety in the March 2011 and November 2011 IEPs but improperly held District adequately addressed Student's anxiety in the May 2009 and April 2010 IEPs, because District's failure to address Student's exhibited anxious behaviors at school shows the IEPs were not reasonably calculated to provide Student educational benefit.*

The IDEA requires that "in the case of a child whose behavior impedes the child's learning . . . [the IEP team must] consider the use of positive behavior interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). The district court held "that Student exhibited anxious behaviors at school which the school was required to address, but did not." ER 53. However,

---

movement education, and motor development" as well as "speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, early identification and assessment of disabilities in children, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services for diagnostic or evaluation purposes." These services are not offered to students in the general educational setting, but they are, by definition, part of special education.

the district court maintained that District put appropriate supports in place for Student's anxiety in the May 2009 and April 2010 IEPs. ER 54-55.

To support this holding, the district court used a "good faith" standard. ER 52-56. The district court quotes an Eighth Circuit opinion, which says, "It is 'largely irrelevant' if the school district could have employed 'more positive behavior interventions' as long as it made a 'good faith effort' to help the student achieve the educational goals outlined in his [or her] IEP." ER 52 (quoting *M.M. v. Dist. 0001 Lancaster County Sch.*, 702 F.3d 479, 487 (8th Cir. 2012)).

While a good faith standard may seem reasonable, it is not the precedent in this Circuit, nor does it trump the standard for the sufficiency of an IEP announced by the Supreme Court in *Rowley* and by this Court in *Amanda J. See Rowley*, 458 U.S. at 206-7; *Amanda J.*, 267 F.3d at 890. The *Rowley* and *Amanda J.* standard is whether the IEP is "reasonably calculated to enable the child to receive educational benefits." *Amanda J.*, 267 F.3d at 890 (quoting *Rowley*, 458 U.S. at 206-7). Under the IDEA, a behavior plan is as much a part of an IEP as any other content or skill area when a child has behavior that impedes her learning. *See* 20 U.S.C. § 1414(d)(3)(B)(i). While a district may make a behavior plan in "good faith," as the Eighth Circuit and the district court suggest, the behavior plan must still meet the "reasonably calculated" standard as announced in *Rowley* and *Amanda J.*, because it is part of the required content of the IEP. *See id.*

Student asks this Court to overturn the district court's holding that the May 2009 and April 2010 IEPs satisfied this standard. The district court cited curriculum modifications and accommodations aimed at reducing Student's anxiety, stating that the only difference between sufficient and insufficient IEPs in the area of behavior supports is that the sufficient IEPs contained a "self-management" curriculum that was removed in the March 2011 and November 2011 IEPs. ER 54-56.

This reasoning is flawed for two reasons. First, even if the presence of a reasonably calculated self-management curriculum were to be considered sufficient to treat Student's anxiety, the self-management curriculum at issue did not meet the reasonably calculated standard. The PLs, AGs, and STOs were not objectively measurable. *See* ER 558, 564, 602, 607. For example, the May 2009 IEP PLs state the following:

> "In class [Student] will take the 'easy road' if [Student] can . . . [Student] raises [Student's] hand in class when [Student] needs help . . . [Student] also will get up and go to the teacher . . . . [Student] is not on task, monopolizing the teachers [sic] attention about an off task topic. [Student's] notebook is well organized."

ER 602. These PLs do not contain any baseline data from which measurable progress can be determined. In addition, the AG and STOs do not directly relate to the PLs.[5]

---

[5] The AG and STOs may at first seem to relate to the PLs, but they are still problematic. For example, the PLs contain a statement that "[Student] raises her hand in class when she needs help." This is directly linked to an STO although it appears from the PLs that Student has already mastered this objective. Thus, the AG and STOs cannot be seen as reasonably

ER 607. Thus, the self-management curriculum fails the reasonably calculated test for an IEP under *Rowley* and *Amanda J.*

Second, the only reason the district court held that the self-management curriculum satisfied the IDEA was because it was developed in "good faith," but as explained above, the standard is not one of good faith but one of whether the curriculum was reasonably calculated to provide Student educational benefit. *See supra* p. 34-35. As analyzed above, this curriculum on its face was not reasonably calculated to provide Student educational benefit. *See supra* p. 35-36. In addition, Student's continued signs of stress and anxiety in the classroom during the relevant statutory period showed that the behavior plan was not working. *See supra* p. 30-33. Because of Student's worsening behaviors, District was on notice that the behavior plan was inadequate but did nothing to fix the problem. In fact, as the district court noted, District removed even the insufficient plan it had in place for Student. ER 55-56. For these reasons, this Court should hold that not only did the March 2011 and November 2011 IEPs violate the IDEA, but the May 2009 and April 2010 IEPs also violated the IDEA, and District denied Student a FAPE when it failed to adequately treat her anxiety under all four IEPs.

---

calculated to provide Student with educational benefit when they merely regurgitate currently mastered skills.

C. <u>The district court improperly held that District's placement of Student was appropriate, because District predetermined Student's placement and the district court failed to consider the proper factors in judging the sufficiency of Student's educational placement.</u>

A district violates the IDEA procedurally if it proposes placement in "a preexisting, predetermined program" without any flexibility to consider alternatives. *Target Range*, 960 F.2d at 1484. Districts must give parents the opportunity to "participate in meetings with respect to the . . . educational placement of the child . . . ." 20 U.S.C. § 1415(b)(1). *See also* 34 C.F.R. § 300.501(c)(1) ("Each public agency must ensure that a parent . . . is a member of any group that makes decisions on the educational placement of the parent's child."). When a district does not consider any alternatives to a proposed placement, that district denies the parents meaningful participation. *Target Range*, 960 F.2d at 1484-85.

Here, District never considered any alternative mixes of regular education classes and special education classes. *See* ER 364-68, 402-10, 504-07, 568-76, 594-96, 610-11. District refused to consider changing Student's math or writing classes to address Parents' concerns regarding Student receiving appropriate instruction. *See* ER 362, 366-67, 397, 399, 868, 872. District also refused to discuss increasing Student's speech services in any meeting with Parents and changed Student's speech services without conferring with Parents. *See* ER 401, 408-09, 890-93. Finally, District specifically told Parents that Student's health class was assigned based on what fit in the schedule, not on what Student needed. ER 349. At no time has District

considered any placement other than what it determined prior to IEP meetings. *See* ER 364-68, 402-10, 504-07, 568-76, 594-96, 610-11.

District also substantively failed to provide Student with an appropriate placement. The district court held Student's placement was appropriate, because "Student's placement team struck the appropriate balance between providing Student both with special education instruction and an opportunity to socialize with regular-education students in [Student's] peer group." ER 62. However, the proper test for determining whether a placement is substantively appropriate is not a balancing test between "special education instruction and an opportunity to socialize with regular-education students," but it is a balancing of the following factors:

> (1) the educational benefits available to the student in a regular classroom, supplemented with appropriate aids and services, as compared with the educational benefits of a special education classroom; (2) the non-academic benefits of interaction with children who were not disabled; (3) the effect of the student's presence on the teacher and other children in the classroom; and (4) the cost of mainstreaming the student in a regular classroom.

*Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1400-01 (9th Cir. 1994).

As stated above, District never considered any alternative mixes of regular education classes and special education classes. *See supra* p. 38. It also refused to adopt a method of instruction that provided any educational benefit to Student. *See*

*supra* p. 30-32. The district court's holding shows how this translates into a placement issue:

> On a practical level, requiring all of Student's teachers to adopt the "Larsen method" when teaching student would work a detriment both to Student as well as Student's classmates. In general education classes, students without special needs would be taught using a teaching pace and method specialized for a student with an intellectual disability. The amount of material covered . . . would be significantly lower, and Student's non-disabled classmates would be forced to learn at the pace of a special education student.

ER 44. By stating that the teaching method the IEP team agreed was the only method that worked for Student would also work a detriment to both Student and Student's classmates in a general education setting, the district court shows that Student's placement was inappropriate under factors one, two, and three of the *Rachel H.* test. District cannot assert that it is unable to provide appropriate services to Student because the placement that District unilaterally placed Student in would negatively impact other students. Thus, by refusing to consider alternate placements, District denied Student a FAPE.

## CONCLUSION

District committed procedural and substantive errors under the IDEA that rise to the level of a denial of FAPE for Student. This Court should overturn the district court's holdings in favor of District and hold that District denied Parents the opportunity to meaningfully participate in Student's education, failed to evaluate Student's transition needs, failed to adequately evaluate Student based on all

available information, failed to create and implement an IEP reasonably calculated to provide Student with educational benefit, and predetermined Student's placement, because each of these violations denied Student a FAPE under the IDEA. This Court should restore all remedies granted by ALJ Messecar; award attorneys' fees, expenses, and costs to Parents up to and including the costs of this appeal; and grant any additional relief it deems just and proper.

### STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Defendant-Appellant knows of no related cases.

Submitted this 8th day of October 2014.

 /s/ Diane Wiscarson
Diane Wiscarson, OSB # 964824

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is proportionately spaced, has a typeface of 14 points or more and contains 9,280 words, which is less than the 14,000 word limit under Fed. R. App. P. 32(a)(7)(b)(i).

Submitted this 8th day of October 2014.

 /s/ Diane Wiscarson
Diane Wiscarson, OSB # 964824

## **CERTIFICATE OF SERVICE**

I hereby certify that I served a true and correct copy of the foregoing DEFENDANT-APPELLANT'S OPENING BRIEF by the method indicated below, on the 8th day of October 2014, and addressed to the following:

Nancy Hungerford

Richard Cohn-Lee

Andrea Hungerford

The Hungerford Law Firm

P.O. Box 3010

Oregon City, Oregon 97045

☐    Hand Delivery

☒    Electronic Mail

☐    U.S. Mail

☐    Facsimile Transmission

 /s/ Diane Wiscarson       
Diane Wiscarson, OSB # 964824