No. 14-35552

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

STUDENT,

*Defendant-Appellant*

V.

FOREST GROVE SCHOOL DISTRICT,

*Plaintiff-Appellee*

---

ON APPEAL FROM UNITED STATES DISTRICT COURT

for the DISTRICT OF OREGON

THE HONORABLE JOHN V. ACOSTA, U.S. MAGISTRATE JUDGE

CIVIL CASE NO. 3:12-CV-01837-AC

---

**DEFENDANT- APPELLANT'S REPLY BRIEF**

---

DIANE WISCARSON

WISCARSON LAW

A PROFESSIONAL CORPORATION

510 SW 3RD AVE., SUITE 439

PORTLAND, OREGON 97204

(503) 727-0202; (503) 727-0303 FAX

TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................4

I.  ALJ MESSECAR'S FINAL ORDER DESERVES DEFERENCE NOT ONLY BECAUSE OF THE LENGTH OF THE OPINION, BUT ALSO BECAUSE IT IS WELL-REASONED, THOROUGH, AND CAREFUL, AS SHOWN BY ALJ MESSECAR'S APPROPRIATE USE OF CASE LAW AND STATUTORY AUTHORITIES................................................6

II.  DISTRICT INCORRECTLY STATED THE STANDARD FOR PROCEDURAL VIOLATIONS UNDER THE IDEA, AND THE DISTRICT COURT FAILED TO PROPERLY APPLY THE STANDARD USED BY THIS COURT IN ANALYZING PROCEDURAL VIOLATIONS...........................................................................................10

A. Although District asserts that discussion of changes to a student's educational plan is an adequate substitute for PWN, the IDEA and implementing regulations make no such allowance, and thus District committed harmful error in failing to provide PWN and denying Parents the opportunity to meaningfully participate in developing Student's IEP..............11

B. The district court properly found that District failed to consider Parents' private evaluation of Student at the November 2011 IEP meeting, and Student does not challenge this holding, contrary to District's assertion......................14

III.  THE DISTRICT COURT EITHER APPLIED THE INCORRECT LEGAL STANDARD TO DETERMINE WHETHER DISTRICT PROVIDED STUDENT A FAPE OR APPLIED THE CORRECT STANDARD IMPROPERLY, BECAUSE THE STANDARD SHOULD CONSISTENTLY BE WHETHER STUDENT'S IEP WAS REASONABLY CALCULATED TO ENABLE THE CHILD TO RECEIVE EDUCATIONAL BENEFIT. ......................................15

A. District failed to properly evaluate Student's transition needs with age appropriate transition assessments, and thus could not create appropriate transition goals for Student................................................................................15

B. District failed to properly evaluate Student in all areas of suspected disability by failing to evaluate Student after receiving information Student had a mental breakdown during the summer between the 2010-11 and 2011-12 academic years..............................................................................................18

C. District failed to provide Student with an IEP reasonably calculated to receive educational benefit, because the present levels (PLs), annual goals (AGs), and short-term objectives (STOs) were not linked to baseline data and were not objectively measurable. .......................................................................21

D. Because progress reports are required under 20 U.S.C. § 1414(d)(1)(A), District has no discretion to decide whether progress reports will be issued to Parents, and therefore, the district court erred in holding that progress reports are not required under the IDEA. ......................................................................23

E. District failed to provide Student a FAPE when it refused to employ the "Larsen method" to teach Student, not because it was an instructional method used by a teacher Parents liked, but because it was the only method that provided Student with educational benefit. .......................................................24

F. The district court improperly applied an incorrect "good faith effort" standard to determine whether District appropriately addressed Student's anxiety in the May 2009 and April 2010 IEPs, because the proper standard is whether the IEP was reasonably calculated to provide Student with educational benefit under *Rowley* and *Amanda J*. ...............................................................25

IV.   THE DISTRICT COURT AND DISTRICT IMPROPERLY ANALYZED STUDENT'S PLACEMENT DETERMINATION UNDER AN INCORRECT STANDARD BECAUSE THE PROPER TEST FOR APPROPRIATE EDUCATIONAL PLACEMENT IS THE BALANCING TEST ANNOUNCED BY THIS COURT IN *SACRAMENTO CITY UNIFIED SCH. DIST. V. RACHEL H*…….....................................................................................................26

**CONCLUSION**.....................................................................................................**29**

**CERTIFICATE OF COMPLIANCE** ..................................................................**30**

## TABLE OF AUTHORITIES

### CASES

*Adams v. State of Oregon*, 195 F.3d 1141 (9th Cir. 1999) ........................................7

*Amanda J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877 (9th Cir. 2001) ......... 7, 9, 25, 26

*Board of Educ. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176 (1982).....7, 10, 15, 21, 22, 24, 25, 26

*County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458 (9th Cir. 1996) ........................................................................................6

*Dep't of Educ., State of Hawaii v. Cari Rae S.*, 158 F. Supp. 2d 1190 (D. Hawaii 2011) ...............................................................................19

*Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038 (9th Cir. 2013)........................10

*L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900 (9th Cir. 2008) ........... 6, 8, 14

*M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634 (9th Cir. 2005)...............................11

*Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115 (9th Cir. 2003) .........................9

*R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932 (9th Cir. 2007) .....................7

*Roland M. v. Concord Sch. Comm.*, 910 F.2d 983 (1st Cir. 1990)..........................10

*Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398 (9th Cir. 1994)....27

*United States v. Mejia*, 69 F.3d 309 (9th Cir. 1995)..................................................9

*Vancouver Sch. Dist.*, 42 IDELR 160 (Wash. SEA December 3, 2004)................19

*W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479 (9th Cir. 1992) ......................................................................................7, 10

S<small>TATUTES</small>

20 U.S.C. § 1414(a)(2)......................................................................... 19, 20

20 U.S.C. § 1414(d) ...................................................................... 17, 18, 26

20 U.S.C. § 1414(d)(1)..............................................................................22

20 U.S.C. § 1414(d)(1)(A) ........................................................................23

20 U.S.C. § 1414(d)(1)(A)(i)(III) ....................................................... 23, 24

20 U.S.C. § 1414(d)(1)(A)(i)(VII)(aa)................................................ 16, 18

20 U.S.C. § 1414(d)(3)(B)(i) .....................................................................26

20 U.S.C. § 1414(d)(1)...............................................................................22

O<small>THER</small> A<small>UTHORITIES</small>

71 Fed. Reg. 156 at 46,641 (August 14, 2006).......................................19

R<small>EGULATIONS</small>

34 C.F.R. § 300.303 ........................................................................... 19, 20

34 C.F.R. § 300.320-324............................................................................26

34 C.F.R. § 300.503 ...................................................................... 11, 12, 13

I.   ALJ MESSECAR'S FINAL ORDER DESERVES DEFERENCE NOT ONLY BECAUSE OF THE LENGTH OF THE OPINION, BUT ALSO BECAUSE IT IS WELL-REASONED, THOROUGH, AND CAREFUL, AS SHOWN BY ALJ MESSECAR'S APPROPRIATE USE OF CASE LAW AND STATUTORY AUTHORITIES.

Although a district court does have discretion to determine what degree of deference to give an administrative decision, the district court abused that discretion by giving little deference to ALJ Messecar's thorough, well-reasoned, and careful opinion. The district court and Forest Grove School District (District) allege that the ALJ's opinion, while lengthy, "consists mostly of extensive descriptions of exhibits and large block quotes from each IEP." ECF No. 16 at 11. *See* ER 20. District also claims that ALJ Messecar's opinion lacks both "quality and quantity" of analysis and application. ECF No. 16 at 13.

However, ALJ Messecar described at length the evidence presented and also documented her reasoning in more than 20 single-spaced pages of detailed analysis. *See* ER 267-87. In *Capistrano*, the case cited by both the district court and District as the standard for the appropriate level of deference that should be given to administrative decisions, the ALJ's 20-page opinion was given a high standard of deference. *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 908 (9th Cir. 2008) (citing *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996)). *See* ER 20; ECF No. 16 at 11. Here, ALJ Messecar's 20 pages of analysis alone is the same length of the entire opinion in *Capistrano*. *See Capistrano*, 556 F.3d at 908; ER 222-89.

Not only is the administrative decision sufficiently detailed, it also includes abundant support from appropriate legal authorities. Both the district court and District unfoundedly purport that ALJ Messecar failed to use appropriate legal support for her conclusions. ECF No. 16 at 12; ER 20-21. But throughout the ALJ's Final Order, she cited controlling case law, statutes, and regulations. For example, ALJ Messecar cited *Board of Educ. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176 (1982) "to set out the two-part test for evaluating complaints about the content of an IEP" and used *Rowley*'s "reasonably calculated" standard in her analysis. ER 267. In fact, ALJ Messecar cited to *Rowley*, one of the preeminent legal authorities in special education law, several times throughout her analysis. *See, e.g.*, ER 267, 275-77, 285.

ALJ Messecar relied broadly on Supreme Court case law and also used precedent from this Court. For example, in analyzing District's procedural violations, ALJ Messecar used this Court's holding from *Amanda J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 891 (9th Cir. 2001) and called upon this Court's other related holdings in *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992), and *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 938 (9th Cir. 2007), for support. *See* ER 269. ALJ Messecar analyzed the legal issues under the "snapshot" rule, as adopted by this Court in *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). As yet another example, ALJ

Messecar stated the standard for when a District provides a student a FAPE by citing *Capistrano*, which is, once again, a case decided by this Court. ER 285; 59 F.3d at 893.

ALJ Messecar not only cited controlling case law, but also quoted directly from controlling statutes and regulations. ALJ Messecar extensively cited and quoted the Individuals with Disabilities Act (IDEA) and sections of the Code of Federal Regulations that govern implementation of special education laws and used those statutes and regulations in the analysis. *See, e.g.*, ER 268-69, 270, 275-76, 284-85. Often, ALJ Messecar included secondary citations to the Oregon Revised Statutes and Oregon Administrative Rules that also govern implementation of special education laws. *See, e.g.*, ER 257, 275. It is not clear from the district court's opinion or District's Answering Brief what more controlling legal standards than the governing statutes, regulations, and case law from this Court as well as the Supreme Court ALJ Messecar might have cited to entitle her opinion to more deference from the district court.

District also claims that ALJ Messecar's opinion is completely absent of "any presentation or discussion of the testimony of both parties' expert witnesses" and implies that because of this, the district court was correct to give the administrative ruling little deference. ECF No. 16 at 13. This statement is patently false, as ALJ Messecar did in fact discuss both parties' expert witnesses' testimony. *See, e.g.*, ER

251-52, 256, 274. ALJ Messecar directly cited District's expert witness testimony throughout the factual findings section of her opinion and also cited District's expert in her analysis of the legal issues. *See, e.g.*, ER 252, 274.

> This Court stated:
>
> There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility. As the Supreme Court stated in *Anderson v. City of Bessemer* . . . : "[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575[.] Live testimony enables the finder of fact to see the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice − matters that cannot be gleaned from a written transcript. Because the district judge is able to hear testimony live and to view the witnesses as they testify, his credibility findings are entitled to deference on appeal.

*Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1127 (9th Cir. 2003) (quoting *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) (internal citations omitted)). In the IDEA context, this Court has also held that the administrative hearing officer "who receives live testimony is in the best position to determine issues of credibility." *Amanda J.*, 267 F.3d at 889. *See also Vashon Island*, 337 F.3d at 1127-28. If ALJ Messecar found Student's expert witness to be more persuasive and credible than District's witnesses, which she did, that was within her purview as the hearing officer who received live testimony, and those determinations should be given deference by the district court and this Court. Thus, the ALJ's opinion was

sufficiently well-reasoned, thorough, and careful and should have been afforded more deference by the district court.

II. DISTRICT INCORRECTLY STATED THE STANDARD FOR PROCEDURAL VIOLATIONS UNDER THE IDEA, AND THE DISTRICT COURT FAILED TO PROPERLY APPLY THE STANDARD USED BY THIS COURT IN ANALYZING PROCEDURAL VIOLATIONS.

District incorrectly stated in its Answering Brief that the legal standard under the IDEA for procedural violations is that a denial of a FAPE should be found only when there was "either (1) a loss of educational opportunity for a student, or (2) a serious infringement of the parent's [sic] opportunity to participate in the IEP process." ECF No. 16 at 14. However, a third prong of this standard is used by this Court when determining whether there has been a procedural violation of the IDEA. *See Rowley*, 458 U.S. at 206-07. The proper standard for a procedural violation under the IDEA is a violation that: (1) results in the loss of educational opportunity, (2) seriously infringes on the parents' opportunity to participate in the IEP formulation process, or (3) causes a deprivation of educational benefit. *Target Range*, 960 F.2d at 1484; *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990). In addition, this Court emphasized in a recent decision that the failure to properly consider alternative educational plans "can result in a lost educational opportunity, even if the student cannot definitively demonstrate that his placement would have been different but for the procedural error." *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1047 (9th Cir. 2013) (adopting the procedural violation standard as stated

in *M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634, 657 (9th Cir. 2005) (Gould, J., concurring in part and concurring in the judgment) (stating that procedural errors rise to the level of denial of a FAPE where, absent the errors, there is a "strong likelihood" that alternative educational possibilities for the student "would have been better considered")).

A. Although District asserts that discussion of changes to a student's educational plan is an adequate substitute for PWN, the IDEA and implementing regulations make no such allowance, and thus District committed harmful error in failing to provide PWN and denying Parents the opportunity to meaningfully participate in developing Student's IEP.

The standards listed above, as held by this Court and others, make it clear that prior written notice (PWN), as required in 34 C.F.R. § 300.503, is an integral part of making sure parents meaningfully participate in developing an educational plan for their children. Without PWN, parents are left wondering what a school district's final decision on their requests for evaluation, identification, or placement will be. PWN facilitates discussion on these topics and gives parents a chance to meaningfully confer with the district about its decision and any future decisions that might need to be made for a child.

ALJ Messecar held that "[t]he repeated failure to send accurate PWN informing the Parents of the status of their requests and the status of the District's actions prejudiced Student and resulted in a loss of the Parents' ability to meaningfully participate in the District's decisions thus resulting in a denial of a

FAPE." ER 270-71. As examples of these repeated failures, ALJ Messecar listed specific instances where District failed to send Parents PWN as required. *See id.* District alleges Student makes new claims by listing other examples of instances where District failed to send PWN in the Opening Brief, but the instances mentioned in ALJ Messecar's holding and Student's Opening Brief are not restricted by ALJ Messecar's broad holding that "repeated failure to send accurate PWN" denied Student a FAPE. *See id.* District misconstrues ALJ Messecar's holding as exclusive of other instances beyond what was explicitly listed in the administrative order. *See id.* Student's use of examples of other instances where District failed to send proper PWN are not new allegations, nor are they excluded by ALJ Messecar's holding that District committed procedural violations of the IDEA when it failed to send proper PWN on many occasions. *See* ECF No. 5-1 at 19-20.

Specifically, District claims one example listed in Student's Opening Brief was not one where PWN was legally required, however District does not explain which instance this was. ECF No. 16 at 15-20. PWN is required whenever a district proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, or educational placement of a child or the provision of a FAPE to the child. 34 C.F.R. § 300.503. All examples listed by Student and ALJ Messecar are covered by this requirement, thus it is unclear what District intended with this assertion. *See* ECF No. 5-1 at 19-20; ER 270-71. In addition, District claims there

was no procedural violation when District unilaterally changed Student's speech services in September 2011 without sending PWN to Parents. ECF No. 16 at 16. While District did send an eventual PWN, it was not sent until November 2011, two months after the unilateral change had been made and implemented by District. *See id.*; ER 26-28. But PWN "*must* be given to the parents of a child with a disability a reasonable time *before* the public agency" makes a decision or change to a student's educational plan. 34 C.F.R. § 300.503 (emphasis added). Two months *after* a change was made is clearly not a reasonable amount of time *before* the change was made, and thus, District's argument fails.

Further, District asserts in its Answering Brief that discussion of topics for which a PWN is required once District has made a decision is sufficient to satisfy the obligation to send PWN. *See* ECF No. 16 at 16-18. District offers no support for this statement, only suggesting Parents were allowed to participate adequately under the IDEA so PWN was not necessary. *See* ECF No. 16 at 18 ("[T]he record shows that each of these issues *was* discussed in at least one meeting with the Parents. It is therefore impossible to see how their ability to 'properly participate' was 'seriously infringed by District's failure to send PWN.'"). However, it is not "impossible to see" how Parents' ability to properly participate was seriously infringed by District. A verbal discussion does not relieve District of its obligations under the IDEA. *See, e.g.*, 34 C.F.R. § 300.503 (requiring PWN to be sent to parents after certain decisions

are made without any reference to what discussion may or may not have occurred).

Although harmless procedural errors do not constitute a denial of a FAPE, *Capistrano*, 556 F.3d at 910, as explained above, multiple failures to send PWN deprived Parents of the abil1.3

ity to meaningfully discuss any of those decisions with District. *See supra* p. 11-13. Thus, ALJ Messecar's holding that District committed harmful procedural violations of the IDEA by failing to send PWN should be affirmed by this Court and the district court's holding should be reversed.

B. <u>The district court properly found that District failed to consider Parents' private evaluation of Student at the November 2011 IEP meeting, and Student does not challenge this holding, contrary to District's assertion.</u>

District claims Student errs as to the district court's holding and that Student asserts the district court improperly found that District did not fail to consider Student's initial private evaluations. ECF No. 16 at 20-21. However, it is unclear why District makes these assertions, because Student did not challenge this holding of the district court. ECF No. 5-1 at 21-22. The district court held there was a procedural violation at the November 2011 IEP meeting when District failed to consider private evaluations provided by Parents, and District admits this fact. ER 32; ECF No. 16 at 21. Student did not claim otherwise, stating instead that "[t]he district court properly found a harmful procedural violation in failing to review [Dr. Buckendorf's] evaluation." *See* ECF No. 5-1 at 21-22 (citing the district court's

Opinion and Order, ER 30-32) (stating the holding of the district court was proper in this instance). Student stated only that "[t]he district court properly held District committed harmful error by failing to consider Parents' private evaluation of Student." ECF No. 5-1 at 21.

III.   THE DISTRICT COURT EITHER APPLIED THE INCORRECT LEGAL STANDARD TO DETERMINE WHETHER DISTRICT PROVIDED STUDENT A FAPE OR APPLIED THE CORRECT STANDARD IMPROPERLY, BECAUSE THE STANDARD SHOULD CONSISTENTLY BE WHETHER STUDENT'S IEP WAS REASONABLY CALCULATED TO ENABLE THE CHILD TO RECEIVE EDUCATIONAL BENEFIT.

District alleges that Student claims the district court should have applied a standard other than the "reasonably calculated" standard when determining whether District provided Student a FAPE. *See* ECF No. 16 at 22. However, Student does not challenge this standard, as set out in *Rowley*, but instead, asks this Court to overturn holdings by the district court that improperly applied that standard or applied an altogether different and incorrect standard. *See Rowley*, 458 U.S. at 206-07.

A.   District failed to properly evaluate Student's transition needs with age appropriate transition assessments, and thus could not create appropriate transition goals for Student.

The district court concluded that assessing a student's transition needs was not an evaluation issue, and thus, analyzed District's failure to conduct age appropriate transition assessments as an issue of whether Student was denied a FAPE. ER 36-37. District inaccurately claims that Student offers no argument to the

contrary.[1] ECF No. 16 at 24. Student's arguments regarding transition revolve around the statutory language that governs implementation of the IDEA's transition mandates. *See* ECF No. 5-1 at 22-25, 32-34. Specifically, Student asks this Court to overturn the district court's holdings regarding inappropriate transition services provided to Student in District's favor, because the IDEA explicitly required District to conduct age appropriate transition assessments of Student in order to create appropriate transition goals. 20 U.S.C. § 1414(d)(1)(A)(i)(VII)(aa). By definition, a transition plan must address "appropriate measurable postsecondary goals *based upon age appropriate transition assessments* related to training, education, employment, and, where appropriate, independent living skills." *Id.* Because a transition plan must be based upon appropriate transition assessments, the issue of whether District conducted such assessments is an evaluation issue, contrary to the

---

[1] District also erroneously claims the district court "noted that there was an adequate transition assessment conducted in December 2011," citing ER 49-50 for this proposition. ECF No. 16 at 33. However, this mischaracterizes the district court's statement at the cited pages. The district court stated, "Unlike the career interest surveys which the District administered in December 2011, the March 2011 discussion was not a formalized assessment which would allow the District to facilitate Student's exploration of career paths. Therefore, the March 2011 transition plan violated the IDEA." ER 50. The district court did not hold that the December 2011 transition assessment was "adequate," as District claims, but states merely that the March 2011 discussion was *more* inadequate than the December 2011 career interest survey and that this inadequacy led to an inappropriate transition plan in the March 2011 IEP. *See id.*

district court's holding and District's assertion. *See* ECF No. 5-1 at 22-25; ECF No. 16 at 23-24; ER 36-37.

But even if this Court were to hold that this issue is not an evaluation issue, the transition plans still denied Student a FAPE, because they were not reasonably calculated to provide her meaningful educational benefit without being based upon individual assessments on what training, education, employment, or independent living skills she might need. The district court held that Student's March 2011 and November 2011 transition plans were appropriate because they contained "reasonable post-secondary goals for a high-school student working toward a modified diploma."[2] ER 49-51. But IEPs are meant to be individualized, hence why they are called *Individualized* Education Programs. *See* 20 U.S.C. § 1414(d) (emphasis added). By holding that a transition plan was appropriate for *this* Student because it was reasonable for *any* high-school student working toward a modified diploma, the district court ignored both the letter and spirit of the IDEA under 20

---

[2] The district court contradicted its own holding in this area. It stated, "The court agrees with the ALJ that the March 2011 transition plan is completely defective." ER 49. But in the same paragraph, it also stated, "These are reasonable post-secondary goals for a high-school student working toward a modified diploma. Thus, the transition plan itself complies with the IDEA." *Id.* It is not clear how the district court could hold that the transition plan was "completely defective," but in the same paragraph claim that "the transition plan itself complies with the IDEA." *See id.*

U.S.C. § 1414(d). Thus, the district court erred in holding that the March 2011 and November 2011 transition plans satisfied the IDEA.

District further claims Student provided no support for her argument that District could not create appropriate postsecondary goals without any age appropriate transition assessments specific to Student's needs. ECF No. 16 at 30-31. However, Student did provide adequate support for this statement in her Opening Brief by citing the IDEA itself, which says, as quoted above, that District must have created "appropriate measurable postsecondary goals based upon age appropriate transition assessments" for Student. 20 U.S.C. § 1414(d)(1)(A)(i)(VII)(aa). *See* ECF No. 5-1 at 22-25, 32-34. *See also supra* p. 15-17. It is unclear what further support District claims Student should provide beyond the federal statute that governs special education law. Therefore, under the IDEA, the district court erred in holding the March 2011 and November 2011 transition plans were appropriate and should be overturned by this Court, because without appropriate transition assessments, the transition plans could not be reasonably calculated to provide Student with educational benefit.

    B. District failed to properly evaluate Student in all areas of suspected disability by failing to evaluate Student after receiving information Student had a mental breakdown during the summer between the 2010-11 and 2011-12 academic years.

Like the district court, District asserts that District's two psychological evaluations of Student in May 2008 and March 2011 satisfied District's obligation

to reevaluate Student after she had a mental breakdown in July 2011. ER 36; ECF No. 16 at 24-25. *See* ER 471-74, 508-11, 614-17, 715-16, 722-23. However, a reevaluation of an IEP-eligible student must occur in three situations: (1) "at least once every 3 years . . . ;" (2) if "the child's parents or teacher requests a reevaluation;" or (3) when a public agency determines "that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation." 20 U.S.C. § 1414(a)(2); 34 C.F.R. § 300.303. Indeed, "public agencies have a continuing responsibility to request parental consent for a reevaluation if they determine that the child's educational or related services needs warrant a reevaluation." 71 Fed. Reg. 156 at 46,641 (August 14, 2006) (to be codified at 34 C.F.R. pt. 300).

In *Vancouver Sch. Dist.*, a district's failure to refer a student for an evaluation following her discharge from a psychiatric hospitalization violated the IDEA child-find provision and denied the student a FAPE. 42 IDELR 160 (Wash. SEA December 3, 2004). In *Dep't of Educ., State of Hawaii v. Cari Rae S.*, the U.S. District Court for the District of Hawaii held that a district failed to properly refer a student for evaluation when it ignored "'warning signs' of an emotional impairment," including the student's discharge from a psychiatric hospitalization. 158 F. Supp. 2d 1190, 1192-1200 (D. Hawaii 2011).

Here, evaluations prior to Student's severe psychotic episode in July 2011 could do nothing to assist District in developing an appropriate IEP for Student. As in *Vancouver Sch. Dist.* and *Cari Rae S.*, Student had a severe psychiatric episode that put District on notice of additional needs she might have. Although Student already qualified as an IEP-eligible student, unlike the students in *Vancouver Sch. Dist.* and *Cari Rae S.*, District's obligation to review information and evaluate Student is the same under 20 U.S.C. § 1414(a)(2) and 34 C.F.R. § 300.303. However, similar to *Vancouver Sch. Dist.* and *Cari Rae S.*, Student's psychotic break was so severe, her doctor recommended Student be placed in a psychiatric ward. ER 722.

Nevertheless, District still failed to initiate a reevaluation based on the new information surrounding Student's psychiatric episode, despite the severity of her changed circumstances since the most recent evaluation four months before the breakdown. *See* ER 471-74, 508-11, 614-17, 715-16, 722-23. Nor was it possible that evaluations done prior to Student's episode could address Student's new needs, which were not known to District or Parents prior to the psychotic episode. *See id.* Thus, District violated its obligation under the IDEA to reevaluate Student when it had new information related to her special education needs. The district court's holding otherwise should be overturned, because Student's IEPs could not be reasonably calculated to provide her with educational benefit when based on outdated information from before her psychotic break.

C. <u>District failed to provide Student with an IEP reasonably calculated to receive educational benefit, because the present levels (PLs), annual goals (AGs), and short-term objectives (STOs) were not linked to baseline data and were not objectively measurable.</u>

District asserts the ALJ used a "hyper-technical" standard in analyzing Student's IEPs to determine if District provided Student a FAPE. ECF No. 16 at 27. However, the standard ALJ Messecar used to analyze Student's IEPs was the reasonably calculated standard from *Rowley*, which is the standard both Student and District agree should be used. *See* ER 276 (quoting the Oregon Administrative Rules that parallel IEP requirements of the IDEA and explaining that violations of the IDEA "may arise in two situations," one of which is when a school district drafts "an IEP that is not reasonably calculated to enable the child to receive educational benefits.") (citing *Rowley*, 458 U.S. at 176); ECF No. 16 at 25; ECF No. 5-1 at 26. Thus, District's argument and the district court's holding on this issue have no merit. *See* ER 40-46.

In addition, District incorrectly claims the district court supported its conclusion that the April 2010, March 2011, and November 2011 IEPs treated Student generically with "examples of objectively measurable goals and details PL statements." ECF No. 16 at 26. As discussed in Student's Opening Brief, the district court used only one self-management PL from the April 2010 IEP to support its holding that all PLs in all relevant IEPs were appropriate, despite also stating the AGs and STOs were "not particularly detailed" and contained only "some objective

measure" of Student's progress. ECF No. 5-1 at 27. *See* ER 41-42. Further, even the self-management PL from the April 2010 IEP used by the district court as an example of a proper PL statement was deficient under the IDEA, because it did not relate to any of Student's AGs or STOs.[3] ECF No. 5-1 at 27. If a PL does not relate to any of a student's AGs or STOs, then the AGs and STOs are not measurable at all, because there is no baseline data from which to determine whether a student has made progress, which is the case here. *See* 20 U.S.C. § 1414(d)(1) (requiring districts to draft measurable annual goals and document progress towards those goals).

District also argues numerical specificity is not required to have adequate PLs, AGs, and STOs. ECF No. 16 at 27-29. However, it is unclear why District makes this argument, as Student did not claim numerical specificity is required under the objectively measurable standard under the IDEA. *See* ECF No. 5-1 at 26-28. The proper standard for provision of a FAPE is whether the requirements of 20 U.S.C. § 1414(d) are met in such a way that the IEP developed is reasonably calculated to provide educational benefit to a child. *Rowley*, 458 U.S. at 206-07; ECF No. 5-1 at 26-27. Under this standard, the PLs, AGs, and STOs in Student's IEPs failed to demonstrate District provided Student a FAPE, because they were not adequately

---

[3] This is discussed in much greater detail in Student's Opening Brief. ECF No. 5-1 at 26-28.

linked to baseline data or were not objectively measurable. Therefore, this Court should reverse the district court's holding to the contrary.

   D. Because progress reports are required under 20 U.S.C. § 1414(d)(1)(A), District has no discretion to decide whether progress reports will be issued to Parents, and therefore, the district court erred in holding that progress reports are not required under the IDEA.

The district court improperly held that progress reports are not required under the IDEA, despite the explicit provision for progress reports in 20 U.S.C. § 1414(d)(1)(A). ER 32. District's only argument addressing progress reports is that the IDEA does not require that progress reports provide numerical specificity. ECF No. 16 at 28.

Two problems arise from District's statement. First, District mischaracterizes the law governing progress reports with this statement. Whether progress reports will be issued is not a decision for the IEP team. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(III). A description of "how the child's progress toward meeting the annual goals . . . will be measured and when periodic reports on the progress the child is making toward the annual goals . . . will be provided" is required under the IDEA. *Id.* The decisions an IEP team may make with respect to progress reports are how often progress reports will be issued and in what manner. *See id.* Thus, District is incorrect in implying an IEP team may decide to make regular progress reports; the IEP team can only determine the period and manner of the reports. *See id.*

Second, Student made no claim that numerical specificity is required in progress reports. *See* ECF No. 5-1 at 28-29. Student's only claim regarding progress reports is that District failed to provide adequate and timely progress reports as required by the IDEA. *Id.* Any progress reports Parents received were months late or insufficient. *See id.* The standard for whether progress reports were adequate under the IDEA is given in 20 U.S.C. § 1414(d)(1)(A)(i)(III) and supplemented by the reasonably calculated standard in *Rowley*. 458 U.S. at 206-07. Here, District's progress reports failed to meet the reasonably calculated standard, not because they lacked numerical specificity as District claims, but because they were insufficient, incomplete, and untimely, thus denying Student a FAPE.[4]

E. District failed to provide Student a FAPE when it refused to employ the "Larsen method" to teach Student, not because it was an instructional method used by a teacher Parents liked, but because it was the only method that provided Student with educational benefit.

District claims Parents requested a specific method of instruction, the "Larsen method," because it was developed by a "single teacher that Student's parents liked" and because it was the best method for instructing Student. ECF No. 16 at 29. However, Student's claim is not that Eric Larsen, the teacher who developed the "Larsen method" was well-liked by Parents, but that the method employed by Mr. Larsen was the only way Student could learn. ECF No. 5-1 at 31-32. Thus, if Student

---

[4] A discussion of the insufficiency of the progress notes in this case is found in Student's Opening Brief. ECF No. 5-1 at 28-29.

could only learn under one instructional style, then it logically follows that to provide Student with meaningful educational benefit, District must employ that method of instruction to provide her with a FAPE. *See id.* By refusing to employ the only instructional technique that was successful with Student, District denied Student a FAPE by failing to develop an IEP reasonably calculated to provide her with meaningful educational benefit.

    F.   <u>The district court improperly applied an incorrect "good faith effort" standard to determine whether District appropriately addressed Student's anxiety in the May 2009 and April 2010 IEPs, because the proper standard is whether the IEP was reasonably calculated to provide Student with educational benefit under *Rowley* and *Amanda J.*</u>

Both District and the district court support a new standard for whether District properly addressed Student's anxiety-related needs in school. ER 52-56; ECF No. 16 at 34. Although District acknowledges the 8th Circuit's "good faith effort" standard is not the precedent in this Circuit, it also claims Student provided no contrary support in this Circuit. ECF No. 16 at 35. However, this is not true, as Student stated in her Opening Brief, this "new" standard does not "trump the standard for the sufficiency of an IEP announced by the Supreme Court in *Rowley* and by this Court in *Amanda J.*" ECF No. 5-1 at 35. *See Rowley*, 458 U.S. at 206-07; *Amanda J.*, 267 F.3d at 890 (quoting *Rowley*, 458 U.S. at 206-07).

The district court held, and District agrees, that because Student's anxiety is a behavior-related part of Student's IEP, a different standard is appropriate. ER 52;

ECF No. 16 at 34. But under the IDEA, an IEP team shall, "in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). Once an IEP team has placed behavioral supports into a student's IEP, it is treated no differently than the rest of the goals, supports, and accommodations under the IDEA, supporting regulations, or case law in this Court or in the Supreme Court. *See* 20 U.S.C. § 1414(d); 34 C.F.R. § 300.320-324; *Rowley*, 458 U.S. at 206-07; *Amanda J.*, 267 F.3d at 890. Thus, the claim that a different standard applies in analyzing whether behavioral supports and accommodations are properly developed and implemented has no merit. Therefore, the district court erred in applying a new good faith standard and should be reversed.

IV. THE DISTRICT COURT AND DISTRICT IMPROPERLY ANALYZED STUDENT'S PLACEMENT DETERMINATION UNDER AN INCORRECT STANDARD BECAUSE THE PROPER TEST FOR APPROPRIATE EDUCATIONAL PLACEMENT IS THE BALANCING TEST ANNOUNCED BY THIS COURT IN *SACRAMENTO CITY UNIFIED SCH. DIST. V. RACHEL H.*

The district court and District claim District was not required to use the "Larsen method" to instruct Student, partially because requiring all of Student's teachers to adopt this method "would be impractical and detrimental to Student and her peers." ECF No. 16 at 30. *See* ER 44. In addition, District alleges Student's placement was appropriate in light of the IDEA's policy of mainstreaming and least restrictive environment. ECF No. 16 at 36. As explained in Student's Opening Brief,

the district court created a new test to determine if Student's placement was appropriate, stating "Student's placement team struck the appropriate balance between providing Student both with special education instruction and an opportunity to socialize with regular-education students in [Student's] peer group." ECF No. 5-1 at 39 (quoting ER 62).

However, both District and the district court failed to apply the proper test to Student's placement decision. This Court set out the standard for placement decisions in *Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1400-01 (9th Cir. 1994). That standard is a balancing of four factors.[5] *Id.*

Student asserts not only that District violated the IDEA by failing to consider any alternative mixes of regular education classes and special education classes, but also that in refusing to employ the "Larsen method," District denied Student an appropriate placement. *See* ECF No. 5-1 at 38-40. *See also supra* p. 22-23. Although the instructional method issue is also analyzed as a substantive denial of a FAPE above, the district court analyzed this question indirectly as a placement issue, and

---

[5] The factors are listed in Student's Opening Brief and include the following: (1) the educational benefits available to the student in a regular classroom, supplemented with appropriate aids and services, as compared with the educational benefits of a special education classroom; (2) the non-academic benefits of interaction with children who were not disabled; (3) the effect of the student's presence on the teacher and other children in the classroom; and (4) the cost of mainstreaming the student in a regular classroom. ECF No. 5-1 at 39 (quoting *Rachel H.*, 14 F.3d at 1400-01).

District indirectly suggests the same flawed analysis. *See* ECF No. 5-1 at 39-40; ECF No. 16 at 30. But, as explained in Student's Opening Brief, by invoking language that relates to how Student's classmates would suffer because of an instructional method required for Student to receive meaningful educational benefit, the district court actually acknowledged this was also a placement issue. ECF No. 5-1 at 40. The two placement issues are interrelated. If teaching Student in the only way she is able to obtain educational benefit will indirectly harm instruction to Student's peers, then Student's placement was not appropriate and District should have considered alternative mixes of regular education classes and special education classes.

Here, District never considered any alternative placements for Student and refused to employ the only instructional method from which Student could gain educational benefit. *See* ER 364-68, 402-10, 504-07, 568-76, 594-96, 610-11. As stated in Student's Opening Brief, "District cannot assert that it is unable to provide appropriate services to Student because the placement District unilaterally placed Student in would negatively impact other students." ECF No. 5-1 at 40. Thus, both the district court and District applied the improper standard in determining whether District predetermined Student's placement or provided Student with an appropriate educational placement. Therefore, this Court should reverse the district court's holding and hold that District denied Student a FAPE by predetermining her placement and failing to provide her with an appropriate placement.

## CONCLUSION

The remedies granted by ALJ Messecar should be restored by this Court, because ALJ Messecar's decision was well-reasoned, thorough, careful, and gave appropriate weight to the evidence and live witness testimony she viewed. Although the district court and District claim ALJ Messecar's remedies were too far-reaching, as analyzed above, they were supported by law and the evidence presented in the underlying due process hearing. For example, prescribing a particular teaching method for a Student who can only receive educational benefit from that method is how District could have satisfied the reasonably calculated standard for an IEP that provides a FAPE. Contrary to District's assertion, weekly counseling sessions to address District's failure to provide appropriate services for Student's significant behavioral difficulties at school was justified by the evidence presented to the ALJ. These remedies and all others granted by ALJ Messecar should be restored by this Court, along with an award of attorneys' fees, expenses, and costs up to and including the costs of this appeal, and any additional relief this Court deems just and proper.

Submitted this 11th day of December 2014.

 /s/ Diane Wiscarson        
Diane Wiscarson, OSB # 964824

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is proportionately spaced, has a typeface of 14 points or more and contains 6,474 words, which is less than the 7,000 word limit under Fed. R. App. P. 32(a)(7)(b)(i).

Submitted this 11th day of December 2014.

  /s/ Diane Wiscarson
Diane Wiscarson, OSB # 964824

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a true and correct copy of the foregoing DEFENDANT-APPELLANT'S REPLY BRIEF by the method indicated below, on the December 11, 2014, and addressed to the following:

Nancy Hungerford

Joel E. Hungerford

The Hungerford Law Firm

P.O. Box 3010

Oregon City, Oregon 97045

☐ Hand Delivery

☒ Electronic Mail

☐ U.S. Mail

☐ Facsimile Transmission

          /s/ Diane Wiscarson    

         Diane Wiscarson, OSB # 964824